**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

BONNIE DROUIN,

Plaintiff,

-against-

UNITED PARCEL SERVICE, INC., JOSEPH
CONFORTI  (sued in his individual capacity
pursuant to New York Executive Law § 290 et seq.)

Defendants.

Case No.: 20-cv-3385

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Bonnie Drouin, by her attorneys SCOTT MICHAEL MISHKIN, P.C.,

complaining of the Defendants, alleges as follows:

**PRELIMINARY STATEMENT**

This case is brought pursuant to (1) 42 U.S.C. §§ 2000e-2000e-17 ("Title VII") against

United Parcel Service ("UPS") and (2) pursuant to New York Executive Law §290 et seq.

("NYEL") against UPS and Joe Conforti ("Conforti") (collectively referred to as "Defendants"),

for their discriminatory treatment of plaintiff based on her gender, for retaliation for engagement

in protected activity and for the creation of a hostile work environment.

**JURISDICTION**

FIRST:      The jurisdiction of the Court over this controversy is based upon

42 U.S.C. §§ 2000e-2000e-17.

SECOND:      The Court also has supplemental jurisdiction over this case pursuant to

28 U.S.C. §1367(a), as Plaintiff's NYEL claims form part of the same case and controversy.

THIRD:      Therefore, this court has proper jurisdiction in this action.

## VENUE

FOURTH:     The unlawful practices alleged below were committed within the State of New York, County of Suffolk.

FIFTH:     At the time of the unlawful practices, plaintiff was a resident of Nassau County in the Eastern District of the United States District Court of New York.

SIXTH:     UPS conducts substantial business in Suffolk County in the State of New York.

SEVENTH:     This Court is hereby the proper venue under 28 U.S.C. § 1391(b).

## PARTIES

EIGHTH:     Plaintiff is a Forty-Nine (49) year old female.

NINTH:     Plaintiff began her career with UPS in 1995.

TENTH:     UPS is a package delivery service and is one of the world's largest package delivery companies.

ELEVENTH:  UPS is an employer as defined under Title VII and NYEL.

TWELFTH:   Conforti was a Division Manager at UPS who had the authority to hire, fire, and make personnel decisions.

THIRTEENTH:     Conforti aided, abetted, incited, controlled, compelled, and/or coerced the acts against plaintiff that are forbidden under NYEL.

FOURTEENTH:     Conforti actually participated in the conduct giving rise to plaintiff's discrimination claims and is thereby individually liable for his willful, wanton and malicious discriminatory treatment against plaintiff pursuant to NYEL.

## FACTS

FIFTEENTH: Plaintiff began her highly dedicated career with UPS in 1995 as a Preloader.

SIXTEENTH: Based on Plaintiff's good performance, she was promoted through the ranks of UPS eventually becoming a Center Manager.

SEVENTEENTH:    However, despite Plaintiff successfully performing her duties and responsibilities, she was the victim of discrimination based on her gender which in turn created a hostile work enviornment permeated with gender based discrimination.

EIGHTEENTH:    On December 4, 2018, Plaintiff went to meet with the Division Manager, Conforti, to discuss the upcoming peak season for UPS.

NINETEENTH:    Plaintiff walked down the hallway to his office and the door was open.

TWENTIETH:    As Plaintiff stepped in to the office she saw to the right of her that Conforti was standing in front of Dawn Mitchell ("Mitchell") who was sitting in a chair.

TWENTY-FIRST:    Plaintiff could not believe what she saw and was traumatized from it.

TWENTY-SECOND: Plaintiff saw Mitchell massaging Conforti's genital area and Conforti had his hands on Mitchell's head.

TWENTY-THIRD:    Plaintiff became afraid, anxious and upset, Conforti jumped and Mitchell laughed.

TWENTY-FOURTH: After witnessing this sexual act, Plaintiff ran down the hall and went to the break area.

TWENTY-FIFTH:     Plaintiff heard from others that Conforti was looking for her but she was too traumatized from what she had just witnessed to speak with him.

TWENTY-SIXTH:     Plaintiff formally complained to Daniel Laterza, Huntington Center Manager, and informed him of the sexual acts she had seen and expressed how damaged and uncomfortable she was feeling and how she did not know who to go to anymore.

TWENTY-SEVENTH:     Plaintiff believes that Dan Laterza told Conforti that Plaintiff had complained to him.

TWENTY-EIGHTH: During the next six (6) months, Conforti would engage in various adverse actions in order to harass and intimidate Plaintiff.

TWENTY-NINTH:   On December 19, 2018, Conforti informed Plaintiff that he was going to make her the Saturday Manager despite promising her that this would not happen and that the new Manager coming in would assume this position.

THIRTIETH: Plaintiff formally complained to Conforti that she believed he was discrimnating against her due to her being a female and that he was favoring the male Managers over her.

THIRTY-FIRST:     Conforti laughed and gave no response.

THIRTY-SECOND:   Plaintiff stated that Conforti was favoring Manager Kevin McCormick ("McCormick") because he is a male and because he covers up for Conforti's indiscretions.

THIRTY-THIRD:     On December 28, 2018, Conforti called all the managers into his office for a meeting where he said that Huntington Center Manager Daniel Laterza needed a break and that he would be swapped with Plaintiff.

THIRTY-FOURTH:  Plaintiff became very upset and once again told Conforti that he was further discriminating and retaliating against her as a female and because of what she knew regarding the sexual incident that took place on December 4, 2018.

THIRTY-FIFTH:     Conforti dismissed Plaintiff's complaint and took no remedial action.

THIRTY-SIXTH:     Plaintiff stated that Daniel Laterza has never been outside of the Melville facility, compared to Plaintiff who has been to several buildings, including the Foster building twice in her career.

THIRTY-SEVENTH: Plaintiff reminded Conforti this is the third time she was told to swap operations with a male manager, because her operation was running well, giving the male manager an easier assignment.

THIRTY-EIGHTH:   Conforti said he would think about it.

THIRTY-NINTH:     During the month of December 2018, Conforti sent a Supervisor, Marlon Guma ("Guma"), to work in Plaintiff's Center. Right away Guma started to cause problems for Plaintiff and her Center.

FORTIETH:   Guma was very negative and constantly made remarks that he felt the way that things were done were stupid and a waste of time.

FORTY-FIRST:     Due to Guma's behavior, Plaintiff had a meeting with Conforti to raise these issues and also told Conforti that Guma seems dangerous and asked why he assigned him to her.

FORTY-SECOND:   Conforti responded by saying "maybe you can fix him."

FORTY-THIRD:     Plaintiff had the good faith belief that Conforti sent Guma to her Center in order to be a disruption so he could contiune to discriminate and retaliate against

5

Plaintiff as the other male Managers did not want Guma in their Center and Conforti granted them this request, unlike Plaintiff's request.

FORTY-FOURTH:   Guma caused numerous disruptions not only with Plaintiff but with other Supervisors as well.

FORTY-FIFTH:   Plaintiff informed Conforti that she and the other Supervisors did not feel safe around Guma but Conforti took no remedial action.

FORTY-SIXTH:   On January 4, 2019 Conforti further discriminated and retaliated against Plaintiff when he announced that she would be the new Saturday Manager despite Plaintiff strongly protesting this and despite Conforti's reassurances that the Saturday Manager position would be given to the new incoming Manager.

FORTY-SEVENTH:  On January 8, 2019, Plaintiff once again complained to Conforti that he was discriminating and retaliating against her and was also allowing Joe Mero to harass her.

FORTY-EIGHTH:   She expressed how Conforti favors the male Managers and is giving Plaintiff Saturdays in retaliation for her previous complaints.

FORTY-NINTH:   Plaintiff expressed that his actions are intentional to harm her well-being.

FIFTIETH:   Conforti dismissed Plaintiff's concern and said he's not discriminating or retaliating against her.

FIFTY-FIRST:   Plaintiff asked Conforti when there would be a follow up meeting to a previous meeting she had with Conforti where Conforti stated her "merit" would be taken away.  Conforti said he would follow up again with Human Resources.  Conforti never got back to Plaintiff.

FIFTY-SECOND:      Due to Plaintiff's formal complaint, Conforti retaliated against her the very next day by removing a Supervisor from Plaintiff's center when her center is supposed to have three.

FIFTY-THIRD:      Plaintiff stated that she is being punished by Conforti taking people away from her.

FIFTY-FOURTH:      This retaliatory action by Conforti was an attempt to frustrate Plaintiff's ability to effectively carry out her responsibilities.

FIFTY-FIFTH:      In further acts of retaliation, Conforti would not answer his phone when Plaintiff would call with work related matters. On January 14, 17, 29, 2019 and February 20, 2019, Conforti refused to answer Plaintiff's phone calls.

FIFTY-SIXTH:      Further demonstration of Conforti's animus towards Plaintiff based on her gender occurred on February 27, 2019 when Conforti praised two other Managers, who are males, for meeting their numbers.

FIFTY-SEVENTH:   However, Plaintiff was also meeting the same numbers but received no acknowledgment from Conforti. Only the male Managers received praise from Conforti.

FIFTY-EIGHTH:      On March 14, 2019, Plaintiff was cornered by four union officers when she was leaving work for the day. Plaintiff felt attacked and threatened.

FIFTY-NINTH:      Plaintiff called Conforti but he did not answer his phone. She then followed up with a text message that went unanswered as well. Conforti was deliberately not answering her calls and text messages in order to further his retaliation against Plaintiff.

SIXTIETH:   On March 25, 2019, Conforti called Plaintiff to discuss late EAMs from her center.

SIXTY-FIRST:        Plaintiff had to explain again that Joe Mero was continuing to sabotage her operation by holding drivers and not assisting on controlling the EAMs out of the trailer.

SIXTY-SECOND:     Plaintiff inquired into whether she was getting her third Supervisor as she has been running her center for three months with only two Supervisors and she has the same work load as the other centers.

SIXTY-THIRD:       Conforti stated that another male Manager only had two Supervisors as well but Plaintiff informed him that this Manager is receiving additional help that Plaintiff is not receiving.

SIXTY-FOURTH:     Conforti stated that he cannot justify giving Plaintiff a third Supervisor.

SIXTY-FIFTH:        Plaintiff asked "to whom can you not justify it to, the other two male managers?" Plaintiff reminded Conforti that 3 Supervisors were in her cost plan.

SIXTY-SIXTH:        On March 29 and April 1, 2019, Plaintiff informed Conforti that Joe Mero was leaving the center a mess and that this was causing service failures for Plaintiff.

SIXTY-SEVENTH:    Plaintiff stated that Joe Mero is intentionally doing these things to hurt Plaintiff. Conforti took no corrective action.

SIXTY-EIGHTH:      April 5, 2019, a meeting was called with Manager McCormick, Division Manager Conforti and Supervisor Sean Marron to review McCormick's poor dispatch score card results.

SIXTY-NINTH:        After the meeting Plaintiff asked McCormick why he did not request Supervisor Mitchell to be in the meeting since she is responsible for the dispatch score card.

SEVENTIETH:        Plaintiff asked McCormick why he keeps covering up for Division Manager Conforti and Supervisor Mitchell, their unprofessional relationship is now getting him unwanted attention.  McCormick knew Mitchell was never at work, yet he did not say anything.

SEVENTY-FIRST:   McCormick stated Conforti promoted him and takes care of him, he has loyalty to Conforti. This demonstrates that UPS had a pattern and practice of allowing its male managers to promote other males in order for them to be loyal to each other.

SEVENTY-SECOND:        Due to the continued favoring of male managers, the intentional sabotaging of her center, the lack of Conforti addressing Plaintiff's claims, and the development of the hostile work environment due to her gender, Plaintiff began to feel weak and like she was falling apart.

SEVENTY-THIRD:   She sent Conforti a text message that she needed to speak with him and Conforti responded that he would call her back. Conforti never called Plaintiff.

SEVENTY-FOURTH:        On April 26, 2019, Plaintiff realized that she did not receive her annual raise and called Conforti. Conforti did not answer.

SEVENTY-FIFTH:    Plaintiff sent a text to Conforti asking if raises were issued this month but Conforti, yet again, did not respond. Plaintiff became very distraught.

SEVENTY-SIXTH:   Upon information and belief, the other male Managers received their annual raises demonstrating the discrimination based on plaintiff's gender and retaliation for her engagement in protected activity.

SEVENTY-SEVENTH:        From approximately September 29, 2018 through April 27, 2019 Plaintiff had been working six days per week.

SEVENTY-EIGHTH: McCormick was also working six days per week but in acts of discrimination and retaliation against Plaintiff, Conforti regularly told McCormick not to stay all day on Saturdays and told McCormick that he could leave after the drivers were dispatched.

SEVENTY-NINTH: Conforti never allowed Plaintiff to have these privileges demonstrating he was treating Plaintiff differently based on her gender and for her engagement in protected activity.

EIGHTIETH: On April 29, 2019, Plaintiff formally complained to Conforti about not receiving her raise. Plaintiff stated that Human Resources has not followed up as she requested and she also told him that she would be escalating the matter.

EIGHTY-FIRST:    Plaintiff stated that she needed to get to the bottom of why her raise was taken away, as she had the good faith belief it was done in order to discriminate and retaliate against her.

EIGHTY-SECOND:  After stating she was going to escalate the matter, Conforti tried to blame Orlando Ruiz for Plaintiff's raise being taken away. Plaintiff told Conforti it must be because she rejected his advances.

EIGHTY-THIRD:    By way of background, during the first quarter of 2018, Plaintiff met with UPS's Employee Relations Manager, Orland Ruiz, concerning a complaint an employee had made.

EIGHTY-FOURTH: During the meeting, Orlando Ruiz was not focused on the investigation but was more concerned with Plaintiff and quickly shifted the focus of the meeting about Plaintiff and her personal life. Orlando Ruiz began asking questions such as "are you married? Do you have a boyfriend? What do you do with your free time? What do you like to eat?"

EIGHTY-FIFTH:     Plaintiff realized that Orlando Ruiz was coming on to her and she quickly stated that she is not interested and asked if he needed anything else for the investigation. Plaintiff got up and opened the door to her office and Orlando Ruiz stated he did not need anything else and left.

EIGHTY-SIXTH:     Plaintiff was upset and shaking. Plaintiff spoke to Operational Excellence Manager, Suki Sayasith, about what had just occurred and how in disbelief she was that this was a Human Resource official who had done this.

EIGHTY-SEVENTH: Seeing how Plaintiff was shaking and upset, Suki Sayasith asked Plaintiff if she wanted to report the incident. Plaintiff stated she did not wish to report it because she did not want to be retaliated against.

EIGHTY-EIGHTH:    On April 30, 2019, Plaintiff formally complained to UPS's Human Resource, specifically, Lisa Robinson ("Robinson").

EIGHTY-NINTH:     Plaintiff explained that she did not receive her raise as she normally would have and expressed that she believed it was because she turned down Orlando Ruiz's advances. Robinson informed Plaintiff that she was driving upstate but she wanted to have a meeting upon her return.

NINETIETH: Robinson and Plaintiff met on May 14, 2019 and Plaintiff explained Orlando Ruiz's sexual harassment of Plaintiff.

NINETY-FIRST:     Robinson said she would need time to investigate these claims and asked if there was more Plaintiff had to tell her.

NINETY-SECOND:  Plaintiff stated she did have more to tell them regarding Conforti but that she did not want to speak of those concerns yet as she preferred not to mix her sexual

harassment complaint about Orlando Ruiz with Conforti's gender discrimination and retaliation complaint.

NINETY-THIRD:     On May 29, 2019, Conforti held a Safety Meeting. In an act of discrimination and retaliation, Conforti made sure that the two male managers had their Supervisors slots filled while he continuously left Plaintiff with empty Supervisor slots.

NINETY-FOURTH:  Conforti showed preferential treatment to the male managers and not to Plaintiff based on the fact that she was a female.

NINETY-FIFTH:     On May 31, 2019, Plaintiff spoke to Conforti and expressed that she is experiencing health and wellness concerns.

NINETY-SIXTH:     Plaintiff stated he continues to discriminate against her.  He takes care of the other two male managers, they get staffing, he communicates with them, he covers for their wrong-doings like scanning, timecard changes or hiding and getting them help in their operations. Plaintiff expressed to Conforti he discriminates against her and agrees with the other two male managers all the time.

NINETY-SEVENTH: Plaintiff expressed to Conforti how Preload Manager Joe Mero continues to intentionally sabotage her operation and Conforti's inaction allows the harassment to continue.

NINETY-EIGHTH:   Plaintiff told Conforti he continues to discriminate against her as a female and this is harassment and retaliation.  Plaintiff expressed that Conforti knows her medical history and knows this discrimination is affecting her.  Conforti denied Plaintiff's concerns and took no remedial action.

NINETY-NINTH:     On June 4, 2019, Conforti and Mitchell were terminated for reasons unknown to Plaintiff.

ONE HUNDREDTH: The other male managers blamed Plaintiff for Conforti and Mitchell being terminated.

ONE HUNDRED FIRST:     The male managers thought Plaintiff reported the sexual incident that occurred on December 4, 2018 between Conforti and Mitchell and how she was being treated as a result.

ONE HUNDRED SECOND: Plaintiff was told by Supervisor Dan Lada that Joe Mero was extremely mad and said he is out to get Plaintiff.

ONE HUNDRED THIRD:    Also on June 4, 2019, Plaintiff formally complained to UPS's Human Resources, specifically Sunny Kurian about the sexual harassment she received from Orlando Ruiz.

ONE HUNDRED FOURTH: Plaintiff expressed how Orlando Ruiz was asking personal questions that did not pertain to an investigation he was conducting.  Orlando Ruiz was asking if Plaintiff was married? Did Plaintiff have a boyfriend?  What does Plaintiff do during her free time? What does Plaintiff like to eat?

ONE HUNDRED FIFTH:    Plaintiff expressed that she became very uneasy due to Orlando Ruiz's actions.  Plaintiff told Orlando Ruiz that she does not have relations with employees of UPS.

ONE HUNDRED SIXTH:    Plaintiff expressed to Sunny Kurian that she did not receive a raise due to Orlando Ruiz's retaliation of rejecting his advances.  Sunny expressed he needs to investigate, and he would get back to Plaintiff.

ONE HUNDRED SEVENTH:        On June 7, 2019 Joe Reimo ("Reimo") became the new Division Manager.

ONE HUNDRED EIGHTH:  On June 10, 2019, Plaintiff expressed to Reimo some of her concerns of Preload Manager Joe Mero's attempts to sabotage her work performance.

ONE HUNDRED NINTH:   Reimo stated his expectation is "we all work together." Plaintiff felt dismissed and it seemed Reimo was more concerned about his days off and disabilities than listening to work related concerns.

ONE HUNDRED TENTH:   On June 28, 2019, Plaintiff emailed UPS  Human Resource officer Sunny Kurian for a  follow up on her complaint of sexual harassment from Orlando Ruiz. Sunny responded "I am off today and out of office the next week. Let's connect the week after."

ONE HUNDRED ELEVENTH:      On July 8, 2019, Plaintiff spoke with Reimo, who just returned from vacation, about an accident that occurred on June 21, 2019.

ONE HUNDRED TWELFTH:      Plaintiff expressed to Reimo that there have been many bad things going on in the Melville facility that Conforti allowed and covered up.

ONE HUNDRED THIRTEENTH: Plaintiff    talked    about    Conforti    and    his unprofessional relationship with Supervisor Mitchell and how Plaintiff walked into Conforti's office and witnessed Mitchell massaging Conforti's groin,  Mitchell's past relationship with service providers in the Patchogue Center causing Plaintiff to reassign her away from the service providers,  Mitchell's past relationship with Joe Mero, Joe Mero's continued threats and physical attacks towards Plaintiff, Joe Mero covering for Mitchell not coming to work, Joe Mero rating Mitchell high in her reviews to assure she gets good raises when that should have been the responsibility of Manager McCormick, Supervisor Jeff Bodt and Supervisor Katlyn Mitchell were having an unprofessional relationship during the work hours,  Preload Manager Joe Mero, Manager Dan Laterza and Manager McCormick were hiding missed parcels by improperly scanning them known closed or future, Manager McCormick was changing timecards and

service providers where recording the changes to make over allowed, and how Manager McCormick had hidden hours and changed timecards for the Melville facility to go "green" or graduate for Saturday Ground Operation.

ONE HUNDRED FOURTEENTH:   Plaintiff spoke about the accident on June 21, 2019 and how McCormick was adamant about not reporting it correctly.

ONE HUNDRED FIFTEENTH:    Plaintiff explained the attack and hostility by Supervisor Marlon Guma.  Reimo asked if Human Resources knew of the attacks and hostility.

ONE HUNDRED SIXTEENTH:    Plaintiff said yes, but there still has been no follow up and it has created a hostile environment, she stated she has been suffering due to this environment of discrimination, retaliation and harassment.

ONE HUNDRED SEVENTEENTH: Plaintiff said she has been discriminated and retaliated against for some time now and it was affecting her health.  Plaintiff stated she just wants her center as assigned and to be left alone, and that she must take care of her health.

ONE HUNDRED EIGHTEENTH:   On August 2, 2019, Plaintiff was interviewed by Security Manager Rich Smith ("Smith") and a Human Resource woman who Plaintiff did not know.

ONE HUNDRED NINETEENTH:   Smith asked Plaintiff about an auto crash.   He showed Plaintiff slides and asked her leading questions.

ONE HUNDRED TWENTIETH:    Smith asked Plaintiff many things about the crash and gave his opinion of how it happened. He asked Plaintiff why it said the car was stopped and Plaintiff could not remember.

ONE HUNDRED TWENTY-FIRST: Plaintiff said she thinks Conforti said to put it down that way and they will check on Telematics the next day.

ONE HUNDRED TWENTY-SECOND:    Smith asked if Plaintiff checked Telematics the next day and Plaintiff stated she  did and the Telematics data was not there to see if the car was stopped.

ONE HUNDRED TWENTY-THIRD:    Plaintiff stated she could not recall many of the details but that it was treated as any other accident would be treated.

ONE HUNDRED TWENTY-FOURTH:    Smith asked Plaintiff why Conforti had sent it to his personal e-mail. Plaintiff had no idea.  Smith then asked Plaintiff about a parcel that had an exception scan on it for weather.

ONE HUNDRED TWENTY-FIFTH:    Plaintiff had no idea about this incident. Plaintiff asked who's ID put "weather" on the parcel and Smith stated it was the District OE Managers ID.  Plaintiff said ask the person who put the exception on as to why it was entered that way.

ONE HUNDRED TWENTY-SIXTH:    After asking many questions Plaintiff could not answer, Smith said he had enough.  Smith turned to the Human Resource woman and asked if she had enough, she said she did.  They both walked out of the room.

ONE HUNDRED TWENTY-SEVENTH:    When Smith and the HR woman returned, they brought Division Manager Robert Turman ("Turman") in the room.  Turman sat down and told Plaintiff due to rules and regulations she was being terminated.

ONE HUNDRED TWENTY-EIGHTH:    Plaintiff asked what rules and regulations. Turman looked around the room and could not answer.  Turman started saying "you know… policies."

ONE HUNDRED TWENTY-NINTH:    Plaintiff stated that this is retaliation, that UPS was on notice of the discrimination and retaliation concerns she had brought up.

ONE HUNDRED THIRTIETH:     Plaintiff was escorted to her office to retrieve her belongings. Smith took Plaintiff's ID badge and her company American Express card.  Plaintiff was escorted to her car.

ONE HUNDRED THIRTY-FIRST:  UPS's excuse that the termination was due to policy and procedure violations was a pretext in order to terminate Plaintiff in retaliation for her engagement in protected activity.

ONE HUNDRED THIRTY-SECOND:     This is demonstrated by the fact that numerous male Managers and Supervisors committed policy and procedure violations that were directly reported to UPS, by Plaintiff, and those individuals were not terminated.

ONE HUNDRED THIRTY-THIRD: The pretext is further demonstrated by the fact that McCormack, a male Supervisor who was also terminated due to this investigation was reinstated.

ONE HUNDRED THIRTY-FOURTH:     Both Plaintiff and McCormack challenged their termination through UPS's internal Employee Dispute Resolution but only McCormack was reinstated at Step 1 unlike plaintiff who was not reinstated.

ONE HUNDRED THIRTY-FIFTH:  Plaintiff made approximately nine (9) complaints to UPS regarding gender discrimination, sexual harassment and hostile work environments.  UPS took no remedial action and allowed the adverse actions to continue.

ONE HUNDRED THIRTY-SIXTH: Defendants' disparate treatment of plaintiff was motivated by an intent to discriminate against plaintiff on the basis of her gender and to retaliate against her for her engagement in protected activity.

ONE HUNDRED THIRTY-SEVENTH:     Defendants treated plaintiff differently than other similarly situated employees who were males.

ONE HUNDRED THIRTY-EIGHTH: Due to the defendants' on-going discrimination and retaliation against plaintiff and their bad faith attempts to cause her harm, a hostile work environment had been created.

ONE HUNDRED THIRTY-NINTH: Plaintiff has suffered physical and mental anguish and severe emotional distress because of the discrimination, retaliation and the creation of the hostile working environment.

ONE HUNDRED FORTIETH: As a result of defendants' discriminatory treatment of plaintiff based on her gender, retaliation for engaging in protected activity and the creation of the hostile working environment, plaintiff has suffered monetary damages.

ONE HUNDRED FORTY-FIRST: Plaintiff has suffered adverse employment actions as a result of being subjected to defendants' discriminatory and retaliatory treatment.

ONE HUNDRED FORTY-SECOND: Plaintiff timely filed her Charge with the EEOC on or about September 25, 2019.

ONE HUNDRED FORTY-THIRD: After receiving her Right To Sue Letter from the EEOC on April 30, 2020, Plaintiff timely filed her complaint in the United States District Court, Eastern District of New York.

**WHEREFORE**, plaintiff demands judgment against defendants as follows:

1. For a money judgment representing actual damages against UPS for gender Discrimination in violation of plaintiff's rights under Title VII;

2. For a money judgment representing compensatory damages against UPS for gender Discrimination in violation of plaintiff's rights under Title VII;

3. For a money judgment representing emotional damages against UPS for gender Discrimination in violation of plaintiff's rights under Title VII;

4. For a money judgment representing punitive damages against UPS for gender Discrimination in violation of plaintiff's rights under Title VII;

5. For a money judgment against UPS representing actual damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of Title VII;

6. For a money judgment against UPS representing compensatory damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of plaintiff's rights under Title VII;

7. For a money judgment against UPS representing emotional damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of Title VII;

8. For a money judgment against UPS representing punitive damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of plaintiff's rights under Title VII;

9. For a money judgment against UPS representing actual damages for retaliation against plaintiff for engaging in protected activity in violation of plaintiff's rights under Title VII;

10. For a money judgment against UPS representing compensatory damages for retaliation against plaintiff for engaging in protected activity in violation of plaintiff's rights under Title VII;

11. For a money judgment against UPS representing emotional damages for retaliation against plaintiff for engaging in protected activity in violation of plaintiff's rights under Title VII;

12. For a money judgment against UPS representing punitive damages for retaliation against plaintiff for engaging in protected activity in violation of plaintiff's rights under Title VII;

13. For a money judgment against UPS representing actual damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

14. For a money judgment against UPS representing compensatory damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

15. For a money judgment against UPS representing emotional damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

16. For a money judgment against UPS representing punitive damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

17. For a money judgment against Conforti representing actual damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

18. For a money judgment against Conforti representing compensatory damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

19. For a money judgment against Conforti representing emotional damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

20. For a money judgment against Conforti representing Punitive damages for gender Discrimination in violation of NYEL § 290 *et seq.*;

21. For a money judgment against UPS representing actual damages for retaliation against plaintiff for engaging in protected activity in violation of NYEL § 290 *et seq.*;

22. For a money judgment against UPS representing compensatory damages for retaliation against plaintiff for engaging in protected activity in violation of NYEL § 290 *et seq.*;

23. For a money judgment against UPS representing emotional damages for retaliation against plaintiff for engaging in protected activity in violation of NYEL §290 *et seq.*;

24. For a money judgment against UPS representing punitive damages for for retaliation against plaintiff for engaging in protected activity in violation of NYEL §290 *et seq.*;

25. For a money judgment against Conforti representing actual damages for retaliation against plaintiff for engaging in protected activity in violation of NYEL §290 *et seq.*;

26. For a money judgment against Conforti representing compensatory damages for retaliation against plaintiff for engaging in protected activity in violation of NYEL § 290 *et seq.*;

27. For a money judgment against Conforti representing emotional damages for retaliation against plaintiff for engaging in protected activity in violation of NYEL §  290 *et seq.*;

28. For a money judgment against Conforti representing punitive damages for retaliation against plaintiff for engaging in protected activity in violation of NYEL §290 *et seq.*;

29. For a money judgment against UPS representing actual damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL § 290 *et seq.*;

30. For a money judgment against UPS representing compensatory damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL § 290 *et seq.*;

31. For a money judgment against UPS representing emotional damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL § 290 *et seq.*;

32. For a money judgment against UPS representing punitive damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL § 290 *et seq.*;

33. For a money judgment against Conforti representing actual damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL §290 *et seq.*;

34. For a money judgment against Conforti representing compensatory damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL § 290 *et seq.*;

35. For a money judgment against Conforti representing emotional damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL § 290 *et seq.*;

36. For a money judgment against Conforti representing punitive damages for the creation of a Hostile Work Environment based on plaintiff's gender in violation of NYEL §290 *et seq.*;

37. For all attorney fees and costs;

38. For equitable relief; and

39. For such other relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff herein demands a trial by jury of all issues in this action.


Dated: Islandia, New York
      July 28, 2020

**SCOTT MICHAEL MISHKIN, P.C.**

By: _____
      Paul A. Carruthers, Esq.
      One Suffolk Square, Suite 240
      Islandia, New York 11749
      Telephone:  631-234-1154
      Facsimile:  631-234-5048
      *Attorneys for Plaintiff*
